UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

In re                                                                           Chapter 11

1974 REALTY ASSOCIATES,                                    Case no.  10-11417

                                           Debtor.

-------------------------------------------------------x

## MOTION FOR AN ORDER (I)(A) APPROVING AUCTION PROCEDURES FOR THE DEBTOR'S REAL PROPERTY, (B) SCHEDULING A FINAL SALE HEARING AND APPROVING FORM AND MANNER OF NOTICE THEREOF, AND (II) ORDER AUTHORIZING AND APPROVING THE SALE OF THE REAL PROPERTY FREE AND CLEAR OF LIENS AND OTHER INTERESTS

1974 Realty Associates, debtor and debtor in possession in (the "Debtor"), hereby submits this motion (the "Motion"), pursuant to sections 105(a), 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for (i) entry of an order (the "Auction Procedures Order"), (a) approving auction procedures (the "Auction Procedures") in connection with the sale of the Debtor's real property located at 1974 51st Street, Brooklyn, New York (the "Property"); and (b) scheduling a final Sale Hearing (as defined below) to consider entry of the Sale Order (as defined below) and approving the form and manner of notice of the auction of the Property and the Sale Hearing, including the form and manner of service of the notice (the "Auction and Hearing Notice"); and (ii) entry of an order (the "Sale Order") authorizing and approving the sale of the Property free and clear of liens and other interests to the successful bidder at the Auction. In support of the Motion, the Debtor, by and through its counsel, respectfully represents:

## JURISDICTION, VENUE, STATUTORY PREDICATE

1.     The Bankruptcy Court has jurisdiction to consider this matter pursuant to
28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is
proper before the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory
predicates for the relief sought in the Motion are sections 105(a), 363 and 365 of the Bankruptcy
Code, and Rules 2002, 6004 and 6006 of the Bankruptcy Rules.

## BACKGROUND

The Chapter 11 Case

2.     The Debtor filed its Chapter 11 Petition on March 18, 2010.

3.     The Debtor's principal asset is an apartment complex located at 1974 51st
Street, Brooklyn, New York (the "Property").  Based upon the Debtor's pre-petition marketing of
the Property, the Debtor believes that the value of the Property is approximately $4.95 million.
In addition, that Debtor has cash on hand of in excess of $800,000.

4.     The purchase of the Property was funded, in large measure, by two
building loans from the Community Preservation Corporation ("CPC") which appear to be
secured by first second mortgages, upon which the Debtor estimates that approximately $3

million is due. The New York City Department of Housing Preservation and Development ("HPD") loaned the Debtor additional sums, which appear to be secured by a third mortgage, upon which the Debtor estimates that approximately $1 million is due.

5.     The Debtor's problems are the product of a dispute among the partners. By way of background, since its inception in 1987 until 2005, the Debtor was controlled by Jonathan Poole, as President of PR & PR Realty Corp ("PR&PR") one of the Debtor's general partners. The relationship between the other partners and Mr. Poole deteriorated over the years, and in January 2005, a PR&PR shareholder called a special shareholders meeting for March 16, 2005. At that meeting, over Mr. Poole's objections, James Sullivan was elected as a director as president of PR&PR.

6.     Mr. Poole commenced litigation challenging the election thereby putting a cloud over management's authority, and two years later the Supreme Court ordered a new shareholder meeting/election, to be held at the offices of PR&PR on December 13, 2007. At that time, Mr. Sullivan was again elected as a director and as president of PR&PR.

7.     By 2007, the Mortgages on the property had long since matured and in fact, CPC had commenced a foreclosure action in or about 2002. The Debtor had nonetheless established a working relationship with CPC and had been making regular payments during the foreclosure action. The Debtor believes that CPC was patiently waiting for the management

dispute to end so that the Debtor could sell or refinance. And following the change of management, the Debtor did in fact enter into a purchase contract with a prospective purchaser.

8. Unfortunately, the prospect of a sale triggered a second lawsuit by Mr. Poole. As a limited partner, he has a right of first refusal. He purportedly exercised that right, but when the Debtor demanded that he close, he sought injunctive relief from the Supreme Court to essentially toll his time to close. He argues, among other things, that he has been deprived of necessary information and that there are issues regarding the distribution of the surplus sale proceeds among the partners.

9. No doubt frustrated by yet another litigation obstacle to payment of its mortgages, in 2009, CPC obtained the appointment of a receiver. The Debtor was dissatisfied (to say the least) with the receiver's management and the costs the receivership imposed upon the Debtor. But in a fortuitous turn of events, in late 2009, the Supreme Court dismissed the 2002 foreclosure action for insufficient service, and the receiver was forced to turn over possession of the Property to the Debtor.

10. In response, CPC started a new foreclosure action. CPC also moved for an order discharging the receiver in the now-dismissed prior foreclosure action. The Debtor assumed that CPC made that motion as a prelude to seeking a receiver in the second now-pending action.

11. Accordingly, the Debtor filed its Chapter 11 case to avoid the harm to the Property that it feared a receiver could cause. More importantly, the Debtor learned that the Bankruptcy Code typically facilitates a sale of property free and clear of all liens, claims and encumbrances, with liens claims and encumbrances to attach to the proceeds of sale. Shortly after the Chapter 11 filing, the Debtor sought authorization to use cash collateral solely to preserve and protect the Property and the parties all agreed to stipulation providing for such relief.

12. The Debtor is now able to move forward with the sale of the Property pursuant to a Chapter 11 Plan.

13. As noted above, the Debtor believes that the value of the Property exceeds all of the claims against the Debtor's estate, and in addition, the Debtor has over $800,000 of cash on hand. Accordingly, the Debtor projects payment in full in cash plus interest to all creditors under the Plan.

14. By this Motion, the Debtor seeks approval of auction procedures. Ultimately, the sale shall be conducted and closed pursuant to the Plan.

15. Based upon the pre-petition history of this case, the Debtor seeks to ensure that each partner's right of first refusal is fully preserved. Annexed hereto as Exhibit C is the Debtor's partnership agreement. The right of first refusal is contained in Article 6.9. As set forth

therein, each partner has a 30 day right of first refusal "on the same terms and conditions" as the proposed purchaser. In order to satisfy this requirement, the Debtor is proposing that after the Debtor selects that winning bidder at the auction sale, the Debtor shall give each partner 30 days notice to its right close on the same terms and conditions. Such terms and conditions would include the immediate posting of a 10% deposit and a closing within 10 business days thereafter.

16. The Debtor proposes that the solicitation of qualified bids for the auction be conducted pursuant to the Auction Procedures attached as Exhibit "A" to this Motion.

## RELIEF REQUESTED

17. By this Motion, therefore, the Debtor first seeks entry of an order, substantially in the form attached hereto as Exhibit B, (A) approving the Auction Procedures, the form of which is attached hereto as Exhibit A for submitting bids for the Property, and conducting an auction (the "Auction") with respect to the Property in the event the Debtor receives more than one qualified bid ("Competing Bids"); and (B) scheduling the Auction and a hearing to approve a sale (the "Sale Approval Hearing") with respect to any qualified bid(s).

18. At the Sale Approval Hearing, the Debtor will request entry of an order, pursuant to sections 105(a) 363 and 365 of the Bankruptcy Code and Rules 2002, 6004 and 6006 of the Bankruptcy Rules, approving the Property Sale.

## AUCTION PROCEDURES

19.     The key provisions of the Auction Procedures are as follows:

### Bid Requirements.

20.     Only bidders that have Submitted qualified bids shall be eligible to participate in the Auction. In order for a Bid to be a "Qualified Bid," a Bid:

(a)     shall include all of the Required Bid Materials;

(b)     shall not be contingent on obtaining financing or due diligence;

(c)     Shall be received by the Bid Deadline; and

(d)     Shall demonstrate the Bidder's ability to consummate promptly.

21.     The required bid materials (the "Required Bid Materials") are as follows:

(a)     Offer: A written offer in the form attached hereto. Such written offer must expressly (i) state that the Bidder's offer is irrevocable until the earlier to occur of (x) the Closing (as defined herein) or (y) ninety (90) days following the last date of the Auction, as adjourned and (ii) disclose whether the Bidder or any of its officers, directors, shareholders, members or partners is a shareholder, employee, or affiliate of the Debtor, or a relative of a shareholder, employee, or affiliate of the Debtor.

(b)     Deposit: Each Bidder shall tender a deposit equal to the greater of (a) ten percent (10%) of the Bid amount or five hundred thousand dollars ($500,000) (the "Deposit"). The Deposit shall be by cashier's check payable to the Debtor. BFK will hold the Deposit of the highest and best Bidder (the "Winning Bidder") at the Auction and the Deposit of the second highest and best Bidder (the "Backup Bidder") at the Auction (or

place such Deposits into a non-interest bearing IOLA account) until three (3) business days after the consummation of a sale of the Property, but in no event later than 90 days following the Court approval of the sale. The Debtor will cause BFK to return the Deposits of all other Bidders within three (3) business days of the conclusion of the Auction. At the conclusion of the auction the Winning Bidder must supplement its deposit so that it is increased to equal 10% of the winning Bid. BFK shall have no liability to any party in connection with its services as escrow agent with respect to Deposits except for willful misconduct, gross negligence or bad faith.

(c)    Executed Contract: An executed and fully completed copy of the sale contract, the form of which is attached hereto, marked to show any changes made.

(d)    Financial Information: Written evidence of a commitment for financing or other evidence of ability to consummate promptly the transaction (such as a current financial statement or copies of Bidder's bank account statements for each of the three months preceding the auction).

## The Auction.

22.    Following the receipt of Qualified Bids, the Debtor seeks conduct an auction of the Property approximately one week thereafter at BFK's offices at 489 Fifth Avenue, New York, New York, 10017, 28th Floor. Unless such requirement is waived by the Debtor, only Qualified Bidders will be allowed to participate at the Auction.

23.    At the auction, the Debtor will first announce the opening bid. All bidding shall be in increments determined by the Debtor. Bidding increments may be modified by the Debtor during the auction. The Property will be sold to the Bidder with the highest and best offer (the "Winning Bidder"), subject, however, to a 30 day right of first refusal by any of the Debtor's

partners. In the event a partner exercises its right of first refusal, such limited partner will be the Winning Bidder.

24. The Backup Bidder shall be the Bidder with the second highest and best Bid, or, in the event that a limited partner exercises its right of first refusal, the Backup Bidder shall be the Bidder superseded by the right of first refusal. The Debtor's selection of the Winning Bidder and the Back Up Winner Bidder shall be subject Bankruptcy Court approval.

25. The Winning Bidder shall supplement its Deposit within one (1) business day of the Auction, (or in the case of an exercise of a right of refusal, within one (1) business day of the exercise of such right), so that, to the extent necessary, such Deposit equals ten percent (10%) of the highest and best Bid accepted by the Debtor at the Auction.

The Closing

26. The sale of the Property shall take place at the New York, New York offices of BFK (or another location mutually acceptable to the parties) within ten (10) business days following the entry of an order by the Court approving the transaction with the Winning Bidder (the "Closing").

<u>Notice</u>

27.     In connection with filing this Motion, the Debtor served a copy of this Motion, the proposed Auction Procedures Order, and all exhibits to such orders upon the following persons electronically and first class mail,  (i) the United States Trustee; (ii) counsel to the secured creditors; (iii) all entities known to have expressed an interest in acquiring the Property; (iv) all parties known to be asserting a Lien against the Property; and (v) all parties filing Rule notices of appearance in this Chapter 11 case (collectively, the "Auction Procedures Parties").

28.     Assuming the Bankruptcy Court approves the proposed Auction Procedures Order, immediately after entry of the Auction Procedures Order, the Debtor will commence service of the Auction and Hearing Notice, including causing such Auction and Hearing Notice to be served upon: (i) the Auction Procedures Parties; (ii) all known creditors of the Debtor; and (iii) all affected federal, state and local regulatory and taxing authorities, including the Internal Revenue Service.

29.     The Debtor believes that the foregoing notice is adequate and sufficient to provide effective notice of the Auction Procedures, the Auction and the proposed Sale to potentially interested parties in a manner designed to maximize the chance of obtaining the broadest possible participation in the sale process while minimizing the estate's administrative costs.  Accordingly, the Debtor requests that the Bankruptcy Court find that notice in this manner

is sufficient and that no further notice of the Auction, the Auction Procedures or the proposed Sale is required.

## BASIS FOR RELIEF REQUESTED

The Proposed Sale is Within the Debtors' Sound Business Judgment

30.     Bankruptcy Code section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate ...." 11 U.S.C. § 363(b)(1).

31.     The Debtor's sale or use of property of the estate outside the ordinary course of business should be approved by the Bankruptcy Court if the debtor can demonstrate a sound business justification for the proposed transaction.  See, e.g., In re Lionel Corp., 722 F.2d 1063, 1070-71 (2d Cir. 1983); In re Ionosphere Clubs, Inc., 100 B.R. 670, 680 (Banks. S.D.N.Y. 1989).

32.     The Debtor submits that there is more than adequate business justification to sell the Property.  Due to the dispute among the Debtor's partners, the Debtor has been unable to effectuate a sale out of Bankruptcy Court, the mortgages have matured and interest is accruing, and a sale should be able to fund a plan paying creditors in full in cash.  The Debtor's

management and professionals concluded, therefore, that the best way to maximize the value of the Debtor's estate for the benefit of their creditors is to sell the Property.

33. Finally, as previously discussed, all creditors and parties in interest will receive adequate notice of the Auction Procedures, the Auction and the proposed Sale. Such notice is reasonably calculated to provide timely and adequate notice to the Debtor's creditors, those parties most interested in this Chapter 11 case, those parties potentially interested in bidding on the Property and others whose interests are potentially implicated by the proposed Sale. The Debtor submits that such notice is sufficient for entry of the Sale Order and satisfies requisite notice conditions for approval of the Sale under Bankruptcy Code section 363(b).

34. Under these circumstances, sound business reasons exist that justify the immediate sale of the Property outside the ordinary course of business and before the confirmation of a reorganization plan. Accordingly, the Debtor submits that the proposed Sale to the Buyer, pursuant to Bankruptcy Code section 363, should be approved.

## The Sale Satisfies the Requirements of Bankruptcy Code

35. Under Bankruptcy Code section 363(f), a debtor-in-possession may sell property free and clear of any interest in such property of an entity other than the estate only if, among other things:

(a)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(b)     such entity consents;

(c)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(d)     such interest is in bona fide dispute; or

(e)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.
11 U.S.C. § 363(f) (Westlaw, 2009).


36.     Since Bankruptcy Code section 363(f) is drafted in the disjunctive,

satisfaction of any one of its five (5) requirements will suffice to permit the sale of the Property

"free and clear" of Liens and Interests. *See In re Dundee Equity Corp.*, 1992 WL 53743, at *12

(Bankr. S.D.N.Y. Mar. 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale free of

the interest concerned may occur if any one of the conditions of § 363(f) have been met.");

*Accord In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986); *In re Wolverine Radio*

*Co.*, 930 F.2d 1132, 1147 fn.24 (6th Cir. 1991).


37.     The Debtor submits that one of the subsections of Bankruptcy Code

section 363(f) applies to holders of liens and interests in or against the Property.  The lien and

interest holders will be adequately protected, because their liens and/or interests will attach to the

net proceeds of the Sale, subject to any claims and defenses the Debtor may possess with respect

thereto.  Accordingly, the sale should be approved under Bankruptcy Code section 363(f).

## NOTICE

38.     Notice of the Motion has been given to all creditors and parties in interest. The Debtor respectfully submits that such notice is sufficient, and request that this Court find that no further notice of the relief requested herein is required.

## NO PRIOR REQUEST

39.     No prior request for the relief requested herein has been made to this or any other Court.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests the Bankruptcy Court enter an order, substantially in the form annexed hereto as Exhibit B, granting the relief requested in this Motion and such other and further relief as may be just and proper.

Dated:  New York, New York
       July 16, 2010

**BACKENROTH FRANKEL & KRINSKY, LLP**
**Attorneys for Debtor**

By:    <u>s/Mark Frankel          </u>
        489 Fifth Avenue
        New York, New York 10017
        (212) 593-1100

Exhibit A

**<u>Exhibit A</u>**

**<u>BIDDING AND AUCTION PROCEDURES</u>**

A.      STEP ONE BID SUBMISSION

Bids ("Bids") will be solicited for the sale of the real property known as 1974 51st Street, Brooklyn New York (the "Property"). The Property is a 4 story 47 unit residential apartment building. Information concerning the Property is available through Massey Knakal Realty of Brooklyn LLC, 205 Montague Street, Third Floor, Brooklyn, New York 11201 ("MK").

The bid deadline (the "Bid Deadline") is 5:00 p.m. on _____, 2010. The Required Bid Materials (as defined below) must be submitted to bankruptcy counsel for the Debtor, Backenroth Frankel & Krinsky, LLP, ("BFK") 489 Fifth Avenue, New York, New York 10017, with a copy to MK, attn: Jeffrey Shalom 205 Montague Street, Third Floor, Brooklyn, New York 11201.

The required bid materials (the "Required Bid Materials") are as follows:

(a)      Offer: A written offer in the form attached hereto as Exhibit 1. Such written offer must expressly (i) state that the Bidder's offer is irrevocable until the earlier to occur of (x) the Closing (as defined herein) or (y) ninety (90) days following the last date of the Auction, as adjourned and (ii) disclose whether the Bidder or any of its officers, directors, shareholders, members or partners is a shareholder, employee, or affiliate of the Debtor, or a relative of a shareholder, employee, or affiliate of the Debtor.

(b)     Deposit: Each Bidder shall tender a deposit equal to the greater of (a) ten percent (10%) of the Bid amount or five hundred fifty thousand dollars ($500,000) (the "Deposit"). The Deposit shall be by cashier's check payable to the Debtor. BFK will hold the Deposit of the highest and best Bidder (the "Winning Bidder") at the Auction and the Deposit of the second highest and best Bidder (the "Backup Bidder") at the Auction (or place such Deposits into a non-interest bearing IOLA account) until three (3) business days after the consummation of a sale of the Property, but in no event later than 90 days following the Court approval of the sale. The Debtor will cause BFK to return the Deposits of all other Bidders within three (3) business days of the conclusion of the Auction. At the conclusion of the auction the Winning Bidder must supplement its deposit so that it is increased to equal 10% of the winning Bid. BFK shall have no liability to any party in connection with its services as escrow agent with respect to Deposits except for willful misconduct, gross negligence or bad faith.

(c)     Executed Contract: An executed and fully completed copy of the sale contract, the form of which is attached hereto as Exhibit 2, marked to show any changes made.

(d)     Financial Information: Written evidence of a commitment for financing or other evidence of ability to consummate promptly the transaction (such as a current financial statement or copies of Bidder's bank account statements for each of the three months preceding the auction).

Unless such requirement is waived by the Debtor, (a) only bidders that have Submitted qualified bids shall be eligible to participate in the Auction and (b) in order for a Bid to be a "Qualified Bid," a Bid:

(a)     shall include all of the Required Bid Materials;

(b)     shall not be contingent on obtaining financing or due diligence;

(c)     Shall be received by the Bid Deadline; and

(d)     Shall demonstrate the Bidder's ability to consummate promptly.

MK will notify by email those parties who have submitted Qualified Bids by on or about 6:00 p.m. on the date that is three calendar days prior to the Auction Date. All Bids shall remain open and irrevocable until the earlier to occur of (a) the Closing (as defined herein) or (b) ninety (90) days following the last date of the Auction, as adjourned.

E.   STEP TWO: The Auction: _____, 2010, at 10:00 a.m.

Following the receipt of Qualified Bids, the Debtor shall conduct an auction of the Property on _____, 2010, commencing at 10:00 a.m. at BFK's offices at 489 Fifth Avenue, New York, New York, 10017, 28th Floor. Unless such requirement is waived by the Debtor, only Qualified Bidders will be allowed to participate at the Auction.

At the auction, the Debtor will first announce the opening bid. All bidding shall be in increments determined by the Debtor. Bidding increments may be modified by the Debtor during the auction. The Property will be sold to the Bidder with the highest and best offer (the "Winning Bidder"), subject, however, to a 30 day right of first refusal by any of the Debtor's partners. In the event a partner exercises its right of first refusal, such limited partner will be the Winning Bidder.

The Backup Bidder shall be the Bidder with the second highest and best Bid, or, in the event that a limited partner exercises its right of refusal first refusal, the Backup Bidder

shall be the Bidder superseded by the right of first refusal. The Debtor's selection of the Winning Bidder and the Back Up Winner Bidder shall be subject Bankruptcy Court approval.

The Winning Bidder shall supplement its Deposit within one (1) business day of the Auction, (or in the case of an exercise of a right of refusal, within one (1) business day of the exercise of such right), so that, to the extent necessary, such Deposit equals ten percent (10%) of the highest and best Bid accepted by the Debtor at the Auction.

F.    The Closing

The sale of the Property shall take place at the New York, New York offices of BFK (or another location mutually acceptable to the parties) within thirty (10) business days following the entry of an order by the Court approving the transaction with the Winning Bidder (the "Closing").

WITH RESPECT TO THE CLOSING, TIME OF PERFORMANCE BY THE WINNING BIDDER IS OF THE ESSENCE.

In the event of that the Winning Bidder fails to consummate the sale after the Sale Hearing because of a breach or failure on the part of the Winning Bidder, the Backup Bidder, as identified at the Sale Hearing, shall be deemed the Winning Bidder without further order of the Court, and shall proceed to Closing no later than thirty (30) days after notice by the Debtor to the

Backup Bidder of the default by the original Winning Bidder. Without limiting the right of the Debtor to seek recovery of actual or additional damages, the Debtor shall be entitled to retain the Deposit of any Winning Bidder who fails to close the transaction because of a breach or failure by such Winning Bidder. Such Deposit shall be deemed forfeited by such defaulting Winning Bidder and shall not be credited against the purchase price paid by the Backup Bidder.

The balance of the purchase price to be paid at closing shall be paid by wire transfer or a bank check or wire at the Closing.

H. Miscellaneous Terms of Sale

Any sale of the Property shall be without representations or warranties of any kind, nature or description by the Debtor, its agents, representatives, consultants and/or attorneys. The Property shall be transferred on an "as is" and "where is" basis.

Subject to Bankruptcy Court approval, all of the Debtor's rights, title and interests in and to the Property shall be sold pursuant to Sections 363 and 365 of the Bankruptcy Code, free and clear of all liens, claims, encumbrances, and security interests, which shall attach to the net proceeds received by the Debtor as a result of the sale with the same force, effect and priority that currently exists, subject to this and further order of the Court.

The Debtor's Plan provides for the exercise of the Debtor's rights under section 1146 of the Bankruptcy Code, however, to the extent such amounts may nonetheless come due, all sales, transfer and recording taxes, stamp taxes or similar taxes, if any, relating to the sale of the Property shall be the sole responsibility of the Winning Bidder and shall be paid to the Debtor at the Closing.

The Property shall not be deemed to have been sold by the Debtor until such proposed transaction is in fact consummated.  Any and all disputes related or pertaining to any aspect of the marketing, Auction or the sale of any of the Property shall be adjudicated solely by the Bankruptcy Court. The submission of a Bid shall constitute an express consent to the exclusive jurisdiction of the Bankruptcy Court for all matters related to the marketing, Auction and/or the sale.

## Exhibit 1

## OFFER & BIDDER REGISTRATION

Bidder, _____, does

hereby offer to purchase on an all-cash basis the Debtor's Property for the following purchase

price: $_____.

Bidder hereby warrants and represents as follows:

(a)     This written offer is subject to the terms and conditions of the accompanying

contract and the "Bidding and Auction Procedures."

(b)     This written offer along with any subsequent verbal bids are irrevocable until the

earlier to occur of (i) the Closing (as defined in the Bidding and Auction Procedures) or

(ii) ninety (90) days following the Auction.

(c)     This written offer is not contingent upon any financing.

(d)     That, except as detailed on an accompanying affidavit, if any, neither Bidder nor

any of its officers, directors, shareholders, members or partners is a shareholder, employee, or

affiliate of the Debtor, or a relative of a shareholder, employee, or affiliate of the Debtor.

(e)     Massey Knakal Realty of Brooklyn LLC ("MK") has been retained by the Debtor to

act as the Debtor's real estate broker. The Debtor shall be responsible solely to MK for any

brokerage fees in connection with the sale of the Property. Bidder will be responsible for, and

agrees to indemnify, defend and hold harmless the Debtor and MK from and against any

brokerage fees or commission claimed by any person asserting entitlement thereto at the alleged

instigation of the Bidder for or on account of its Bid and the transaction contemplated in connection

therewith.

(f)     That Bidder had an opportunity to, or waived any right to, inspect and examine the Property identified above and all other pertinent documents with respect thereto prior to making its offer and that Bidder relied solely on that review and upon its own investigation and inspection of the Property in making its offer; that Bidder is not relying upon any written or oral statements, representations or warranties of the Debtor, its agents, representatives, consultants and/or attorneys, and that Bidder has obtained a complete copy of the "Bidding and Auction Procedures" and has read and understood same and agrees to abide by and be bound by such "Bidding and Auction Procedures."

AGREED & ACCEPTED this _____ day of _____, 2010.

By:

Name:

Title:

BIDDER I.D.

Bidder's Address: _____

Bidder's Contact: _____

Bidder's Phone/Facsimile_____

Bidder's Email Address:_____

Bidder's Tax ID Number: _____

ATTORNEY I.D.

Bidder's Attorney: _____

Bidder's Attorney's Address: _____

Bidder's Attorney's Phone/Facsimile #_____

Bidders' Attorney's Email Address:_____


BANK REFERENCE

Bank Name & Bank Contact: _____

Bank Address:_____

Bank Contact's Phone Number: _____

Exhibit B

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

In re                                                              Chapter 11

1974 REALTY ASSOCIATES,                                Case No. 10-11417

                              Debtor.
------------------------------------------------------------x

## NOTICE OF BIDDING AND AUCTION PROCEDURES, AUCTION DATE AND HEARING RESPECTING A SALE OF THE DEBTOR'S REAL PROPERTY

PLEASE TAKE NOTICE, that pursuant to a motion filed by 1974 Realty Associates, Inc. the above-captioned debtor and debtor-in-possession (the "Debtor") dated July    , 2010 (the "Motion"), the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") entered an Order (the "Bidding Procedures Order") approving the procedures annexed hereto as Exhibit A (the "Bidding and Auction Procedures") in connection with an auction (the "Auction") of that certain real property owned by the Debtor know as 1974 51st, Brooklyn, New York (the "Property"). All inquiries concerning the Property should be made to Massey Knakal Realty of Brooklyn LLC, 205 Montague Street, Third Floor, Brooklyn, New York  11201.

PLEASE TAKE FURTHER NOTICE, that in accordance with the Bidding and Auction Procedures (a) interested parties will have the opportunity to make offers on the Property and (b) the Debtor will select the highest or best bid for the Property and seek approval from the Bankruptcy Court of the entity submitting such bid.

PLEASE TAKE FURTHER NOTICE, that pursuant to the Bidding and Auction Procedures, the Auction will be conducted at the offices of Backenroth Frankel & Krinsky, LLP, 489 Fifth Avenue, New York, New York, on _____, 2010 at 10:00 a.m. (Eastern Standard Time). The Auction may be adjourned from time to time without further notice except by announcement of the adjourned date or dates at the Auction or any adjournment thereof.

PLEASE TAKE FURTHER NOTICE, that the Debtor will seek, among other things, entry an order at the Sale Hearing approving pursuant to Sections 363 of the Bankruptcy Code, the sale of the Property, free and clear of all liens, claims, encumbrances and security interests, with such liens, claims, encumbrances and security interests will attach to the net sale proceeds with the same validity and priority that currently exists, and related relief. The Debtor shall also seek authority to proceed with the sale of the Property to any applicable Backup Bidder in the event that the Winning Bidder fails to close its transaction at the Closing.

PLEASE TAKE FURTHER NOTICE, that any and all objections shall be set forth in writing and state with particularity the grounds for such objections or other statements of position and shall be electronically filed with the Bankruptcy Court and served so as to be actually

received by the undersigned and the Office of the United States Trustee, 33 Whitehall Street,

New York 10004, so as to be received no later than 4:00 p.m. on _____,

2010.


        PLEASE TAKE FURTHER NOTICE, that the Bankruptcy Court will hold a

hearing on _____, 2010 at _____, to consider and approve the sale (the "Sale

Hearing"). The Sale Hearing may be adjourned from time to time without further notice except

by announcement of the adjourned date or dates at the Sale Hearings or any adjournment thereof.


Dated: New York, New York
        _____, 2010


        **BACKENROTH FRANKEL & KRINSKY, LLP**
        **Attorneys for the Debtor**


     By:    s/Mark Frankel_____
           Mark Frankel, (MF 8417)
           489 Fifth Avenue
           New York, New York 10017
           (212) 593-1100

Exhibit 2

To be supplied

Exhibit C

# LIMITED PARTNERSHIP AGREEMENT

## OF

## 1974 REALTY ASSOCIATES

AGREEMENT made this 19 day of November, 1987 by and between MIDWOOD FRIENDS DEVELOPMENT CORP., having its principal place of business c/o Barry Mallin, Esq., 56 Thomas Street, New York, New York ("MFD") [hereinafter sometimes referred to as "General Partner"] and PR & PR REALTY CORP. having its principal place of business at 201 Eastern Parkway, Brooklyn, New York, ("PR &PR") [hereinafter sometimes referred to as "Managing General Partner" or "General Partner] and SEYMOUR B. ROBINSON, residing at 5251 N.W. 80th Avenue Road, Ocala, Florida 32675, JEROME S. REZNICK, residing at 6 Fir Drive, Kings Point, New York 11024, JONATHAN POOLE, residing at 245 East 19th Street, New York, New York and LAWRENCE PESCE, residing at 2414 Beverly Road, Wantagh, New York (hereinafter sometimes referred to as "Limited Partners"). The General Partners and Limited Partners are herewith collectively referred to as the "Partners" and reference to a "Partner" shall be any one of the Partners.

WHEREAS, MIDWOOD FRIENDS DEVELOPMENT CORP. has entered into a contract to purchase certain premises consisting of land and improvements thereon, presently known as 1974 51st Street, Borough of Brooklyn, City and State of New York, as is more particularly described on Exhibit A attached hereto (hereinafter referred to as the "Property"); and

RESPONDENTS
000042

WHEREAS, the parties hereto desire to form a Limited Partnership to acquire, improve, develop and manage the Property; and

WHEREAS, the parties hereto desire that MFD assign all of its right, title and interest to the Limited Partnership to be formed for such purpose and the Limited Partnership shall assume the interest of MFD in the contract of sale dated as of July 17, 1987 between LHL REALTY CO. and MIDWOOD GARDENS ASSOCIATES, as Seller and MIDWOOD FRIENDS DEVELOPMENT CORP., as Purchaser for the property and shall acquire the Property in accordance with the terms of the contract of sale, and repay to MFD the sum of $5,000 which they have deposited on contract; and

WHEREAS, it is the understanding of the Partners that part of the consideration for entering into this agreement is to provide housing for the following low income tenants in the Property, after the improvement of the Property is completed, to wit:

FERNANDO GAMARRA - 1975 51st Street, Brooklyn, NY

PSI-YI-JEN - 1975 51st Street, Brooklyn, NY

THERESA DALY or KATHLEEN DALY - 1975 51st Street, Brooklyn, NY

MICHAEL DALY - 1975 51st Street, Brooklyn, NY

MYLDA SOTO - 5110 19th Avenue, Brooklyn, NY

MYDA MIRANDA - 5110 19th Avenue, Brooklyn, NY

VINCENZO ROMANO - 1975 51st Street, Brooklyn, NY

SOL LIPSCHITZ - 1975 51st Street, Brooklyn, NY

JUAN PEREZ - 5110 19th Avenue, Brooklyn, NY

SOPHIA BENITEZ - 5110 19th Avenue, Brooklyn, NY

It is specifically understood and agreed that the foregoing tenants shall be entitled to an apartment in the Property provided, however, that the persons set forth on the above list must meet all HUD and HPD requirements for low income tenants. If the aforementioned persons fails to meet the low income eligibility requirements the apartments in the Property will be rented to them at a market rental rate. MFD agrees to make payment of any differential between the low income rent and the market rent that the aforementioned parties will pay if they do not meet the low income eligibility requirements.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, the parties hereby form a Limited Partnership (the "Partnership") pursuant to the Partnership Law of the State of New York and upon the following terms and conditions.

## ARTICLE I

## NAME, PRINCIPAL OFFICE AND TERM

1.1 **Formation of Partnership.** The parties hereby confirm the creation of the Partnership for the acquisition, improvement and development of the property

1.2 **Name of Partnership.** The Partnership shall be conducted under the name of "1974 REALTY ASSOCIATES".

3

RESPONDENTS
000044

1.3   **Principal Office.**   The principal office and place of business of the Partnership shall be 475 Tuckahoe Road, Yonkers, New York, 10710 or at such other place or places as the Managing General Partner (as defined in Section 6.2(a) hereof) may hereafter determine and of which the General Partners shall give notice to the Limited Partners.

1.4   **Term.**   The term of the Partnership shall commence on the date of filing of the Certificate of Limited Partnership as set for in Section 4.2 of this Agreement and shall terminate upon the earliest of the following:   (a)   December 31, 2031;  (b)  the Managing General Partner being declared a bankrupt under the United States Bankruptcy Code; (d)  the withdrawal or retirement of the Managing General Partner from the Partnership in violation of the provisions of this agreement unless the Partnership is reconstituted as provided in Section 10.1 of this Agreement or (e) the divesting by the Partnership of its entire interest in the Property and of title to all assets, real or personal, that it may receive from a sale, exchange or other disposition of its entire interest in the Property.

## ARTICLE II

### DEFINITIONS

2.1  "**Additional Contributions**" with respect to any Partner shall mean the sum of such Partner's contributions, if any, to the

4

RESPONDENTS
000045

capital of the Partnership in excess of such Partner's Original Invested Capital.

2.2 **"Affiliate"** (a) when used in respect of any Partner shall mean (i) such Partner, and (ii) any person or corporation which has any interest (direct or indirect, financial or otherwise) in such Partner or in which such Partner has any interest, including, without limiting the generality of the foregoing, any person or corporation which directly or indirectly controls or is controlled by or is under direct or indirect common control with such Partner. For the purpose of this definition the term "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as used in respect of any person or corporation shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such person or corporation, whether through ownership or voting securities or interest or by contract or otherwise; the term "person" shall mean and include any individual, sole proprietorship, partnership (general or limited), joint venture, trust or similar unincorporated business association; and the term "corporation" shall mean and include, without limitation, any joint stock company, voluntary association, business trust or similar organization.

2.3 **"Agreement"** shall mean this Agreement of Limited Partnership as it may be amended from time to time.

5

RESPONDENTS
000046

2.4 "Capital Account" when used in respect of any Partner shall include the Capital Contribution made by such Partner to the Partnership and shall be increased by the amount of all Profits credited to the account of such Partner.

2.5 "Capital Contribution" in respect of any Partner shall mean the sum of such Partner's Original Invested Capital and Additional Contributions.

2.6 "Capital Distributions" shall refer to cash or other property from any source distributed to the Partners pursuant to the provisions of this Agreement, but shall not include any payment to either General Partner made pursuant to the provisions of Sections 6.4 and 6.7.

2.7 "Code" shall mean the Internal Revenue Code of 1986, as amended, corresponding provisions of subsequent revenue laws, and all regulations and rulings promulgated thereunder.

2.8 "Original Invested Capital" shall be the amounts set forth in Section 5.2 next to the respective names of the Partners.

2.9 "Partnership Property" shall refer collectively to the Partnership's interest in the Property and any other assets, including, without limitation, promissory notes or other instruments of indebtedness, contract rights or property, real or personal acquired by the Partnership during the term of this Agreement.

2.10 "Partnership's Accountants" shall refer to Frank & Zimmerman & Company.

2.11 "Partnership Attorney" shall refer to Jules W. Schapiro.

6

RESPONDENTS
000047

## ARTICLE III

## BUSINESS AND PURPOSES

3.1  To acquire title to the Property and develop the Property and in connection therewith to purchase, own, develop, improve, operate, manage, lease, finance, and sell all or part of the Property and carry·on any other activity necessary or appropriate in connection with or incidental to the foregoing as permitted by law.

## ARTICLE IV

## CERTIFICATE AND OTHER INSTRUMENTS

4.1  <u>Certificate of Limited Partnership.</u>  Contemporaneously with the execution and delivery of this Agreement, the Limited Partners shall execute, acknowledge and deliver to the Managing General Partner a Certificate of Limited Partnership.

4.2  <u>Filing and Publication</u>.  Immediately after the Partners have executed and delivered a Certificate of Limited Partnership referred to in Section 4.1, the Managing General Partner shall cause such Certificate to be filed in the Office of the Clerk of Kings County and thereafter shall promptly cause said certificate to be published as required by Section 91 (1)(b) of the Partnership Law of the State of New York.

4.3  <u>Power of Attorney.</u>  The Limited Partners hereby irrevocably constitute and appoint the Managing General Partner its true and

7

RESPONDENTS
000048

lawful attorney, in its name, place and stead, to make, execute, acknowledge and file:

(a) such other certificates or instruments as may be required by law to maintain the status of the Partnership as Limited Partnership as constituted from time to time or as may be required to carry out and give effect to the provisions of this Agreement.

(b) make and execute any and all documents with the acquisition, funding, mortgage document and each and other documents necessary and required with the improvement and operation of the Property.

The Limited Partners shall execute such instruments as the General Partners may reasonably request in order to give evidence of the granting of this Power of Attorney. The General Partners shall have no right hereunder to amend or modify this agreement without the written consent of the Limited Partners.

## ARTICLE V

## CAPITAL CONTRIBUTIONS

5.1 <u>Agreement to Contribute.</u> Each Partner shall contribute to the Partnership, at the time, in the amount and in the manner hereinafter provided in this Article.

(a) The amount of cash contributed by each General Partner is as follows:

8

| GENERAL PARTNERS | UNDIVIDED PERCENTAGE INTEREST | CASH CON-TRIBUTION |
|---|---|---|
| MIDWOOD FRIENDS DEVELOPMENT CORP. | 1% | $100.00 |
| PR & PR REALTY CORP. | 1.25% | $125.00 |

(b)   The amount of cash contributed by each Limited Partner is as follows:

| GENERAL PARTNERS | UNDIVIDED PERCENTAGE INTEREST | CASH CON-TRIBUTION |
|---|---|---|
| SEYMOUR B. ROBINSON | 26.3625% | $2,636.25 |
| JEROME S. REZNICK | 26.3625% | $2,636.25 |
| JONATHAN POOLE | 9.875% | $ 987.50 |
| LAWRENCE PESCE | 35.15% | $3,515.00 |

5.2   Initial Contribution.   (a)   MFD has executed simultaneously herewith, an assignment of the Contract of Sale for the Property to the Partnership.   A copy of the Contract of Sale and the assignment thereof have been initialled by the Partners.

(b)   The Limited Partners shall contribute the amount set forth opposite its name as Original Invested Capital on five days prior written notice from the General Partner.

5.3   Loans by Partners or Others.   The Managing General Partner shall arrange for all of the necessary and required funds to be obtained in connection with the purchase of the Property and its development, renovation and improvement.   PR & PR   will contribute all of the necessary capital to acquire title to the Property including any attendant fees in connection therewith

9

RESPONDENTS
000050

including but not limited to title insurance, building insurance, legal fees, mortgage tax, etc. It is understood that the funds in connection with the remodeling and improvement to the Property will be obtained from The New York City Community Preservation Corporation, The City of New York Department of Housing Preservation and Development and The United Stated Department of Housing and Urban Development under HUD's Housing Development Grant Program ("HDG"). The proceeds of the said mortgage loans shall be used in connection with the development and improvement of the Property. The Partnership has executed commitments for each of these loans. The Partnership shall execute all loan documents required in connection with the financing of the development and improvement of the premises. All reasonable costs incurred by the Partnership in connection with the procuring of the said loan shall be paid by the Partnership.

5.4 **Additional Contributions or Loans.** In the event that the Partnership shall incur liabilities in excess of the assets of the Partnership or in the event that the assets of the Partnership shall be insufficient to pay all of these liabilities as they mature and the General Partners, or either of them, shall incur any personal liability therefor, the Limited Partners do hereby agree to indemnify the General Partners, or either of them, and save and hold them harmless from any and all liability, claim or expense, including reasonable attorneys' fees, that they may sustain or become liable for. Each of the Limited Partners shall be liable on the aforesaid indemnity in the same

10

RESPONDENTS
000051

proportions as set forth in subparagraph (a) and (b) of paragraph 5.1.

5.5 **Interest on Capital Contributions and Commissions or Drawings.** None of the Partners shall receive any interest on his contribution to the capital of the Partnership, and the contribution by the parties to the capital of the Partnership, whether of a General Partner or a Limited Partner, shall be treated alike and without priority or distinction among them and in the event of any distribution of the capital of the Partnership at any time, there shall be no priority in distribution as between the contributions or interest in the capital of the Partnership of either of the General or Limited Partners, except as provided in Article VIII hereof.

## ARTICLE VI

### RIGHTS, POWERS, OBLIGATIONS OF THE GENERAL PARTNERS

6.1 **Management of Business.** Except as provided in Section 6.3 hereof, the Partnership shall be managed and the conduct of its business shall be controlled solely by the General Partners in accordance with the provisions of this Agreement and the provisions of the Partnership Law of the State of New York. However, the General Partners agree that the actual management of the Property will be under the purview of Rosedale Management Company,Inc.as Managing Agent who will consult with the General Partners concerning the management and operation of the Property.

11

RESPONDENTS
000052

(c)   No General Partner shall be liable, responsible, or accountable for damages or otherwise to any of the Partners, General or Limited, for any act performed by him within the scope of this agreement, provided such act was performed in good faith and without gross negligence.   All expenses or liabilities incurred by a General Partner for any act performed by him within the scope of this agreement, including attorneys' fees, costs and expenses, reasonably incurred in the defense of any action, suit or proceeding, shall be reimbursed out of the assets of the Partnership, unless the act or acts giving rise to such liability or expense, were performed in bad faith or gross negligence.

(d)   Except as provided in this Section 6.2 and subject to the restrictions on the authority of the General Partner as provided in Section 6.3, the Managing General Partner shall make all policy and decisions in connection with the day-to-day operation of the Property and shall have the authority to carry out, implement and exercise any and all of the objects, purposes and powers of the Partnership set forth in Article III hereof and the General Partners shall have the authority and power:

(i)   to bring, defend and settle actions at law or in equity;

(ii)   subject to the provisions of Sections 6.3 and 6.4, to employ or retain, on behalf of the Partnership, such persons, firms or corporations, including themselves or Affiliates, as the Managing General Partner, in its sole judgment, deems advisable in the operation and management of the Partnership's business, including, without limitation, such architects, contractors,

14

(v)  sell the Property except as herein provided or as provided in Section 6.9 or with the consent of the Limited Partners;

(vi)  permit General Partners to sell, transfer, pledge, encumber or otherwise transfer any of its interest in the General Partner except as provided in Section 10.1.

6.4  **Dealing with Related Persons.**  The Managing General Partner may, on behalf of the Partnership, employ or retain the services of or make purchases of materials or services from an Affiliate, provided that (a) with respect to retaining services of an Affiliate (i) the Affiliate be qualified and experienced in rendering any such services, and (ii) the fees paid to the Affiliate for rendering such services are no higher than fees which would be paid for such services to similarly qualified and experienced persons or firms rendering comparable services at the locality of the Property, and (b) with respect to the purchase of materials, the cost of such materials are no higher than the cost thereof would be from reputable persons or firms supplying comparable materials at the locality of the Property.

6.5  **Liability of General Partner.**  The General Partners shall not be liable, responsible or accountable, in damages or otherwise, to the Limited Partners or the Partnership for any acts performed by it as authorized by this Agreement on behalf of the Partnership within the scope of the authority conferred upon it by this Agreement or done in good faith or based upon the opinion of counsel.  Notwithstanding the foregoing, the General Partners and its employees or agents, shall not be relieved from

16

RESPONDENTS
000056

any liability for acts of fraud, malfeasance, bad faith or gross negligence or acts constituting a breach of fiduciary duty to the Partnership or to the Limited Partners.

6.6 **Indemnification of General Partners.** The General Partners shall be entitled to be indemnified by the Partnership for any loss which it may incur in its capacity as General Partners and on account of any claim, liability, action or damage for any act performed or omitted to be performed by it within the scope of the authority conferred by this Agreement or done or omitted to be done in good faith or based on the opinion of counsel, and on account of all reasonable attorneys' fees, incurred in connection therewith, except for acts of fraud, malfeasance, bad faith, gross negligence or acts constituting a breach of fiduciary duty to the Partnership and/or the Limited Partner, provided that any indemnity under this Section 6.6 shall be paid only out of and to the extent of the Partnership Property.

6.7 **Partnership Expenses.** The Partnership shall pay all expenses incurred in the formation of the Partnership and the conduct of its business, which expenses may include, without limitation (a) reimbursement to the General Partner for its reasonable out-of-pocket expenses incurred in the performance of its duties as General Partner; and (b) expenses in connection with preparing and mailing reports required by this Agreement to be furnished for tax reporting purposes.

6.8 **Services of General Partner; Other Activities Permitted.**
Except for reimbursement of out-of-pocket expenses, and payment

17

RESPONDENTS
000057

of the fees as provided in Section 6.7, the General Partners shall not be entitled to any compensation or fees for performing services for or on behalf of the Partnership (except as otherwise specifically provided for in this Agreement) and shall only be entitled to the allocations of Profit, Loss, Capital Distributions and payments of Cash Flow provided for in this Agreement. The General Partner and its Affiliates shall not be precluded from engaging in any other business activity in a manner not inconsistent with the foregoing, or from receiving compensation therefrom or participating in the profits thereof, which activity may include the development or ownership of, or investment in, real estate and the operation and management of real estate at all places, whether or not in direct or indirect competition with the Property. Such activities shall not be deemed to constitute a partnership opportunity.

6.9 **Sale of the Property: Right of First Refusal.**

(a)   If the Managing Partner shall determine that it wishes to sell the Property it shall offer the Property to the other General Partner at a sum which the Managing General Partner determines is the value of the Property. The other General Partner shall then indicate either its willingness or refusal to purchase the Property at the price and terms designated by the Managing General Partner within thirty (30) days of notification by certified mail, return receipt requested.

(b)   If the other General Partner has refused to purchase the Property as provided in paragraph 6.9 (a) hereof, then the

18

RESPONDENTS
000058

Managing General Partner may attempt to procure a Purchaser for the Property upon the same terms and conditions offered to the other General Partner as indicated in said paragraph 6.9(a). If the Managing General Partner obtains a purchaser for the property upon terms and conditions other than as offered to the other General Partner as indicated above the, and in such event, the Managing General Partner shall again offer the Property for sale to the other General Partner upon the same terms and conditions set forth in the contract or other agreement with a prospective purchaser. It shall give the other General Partner and the Limited Partners written notice by certified mail, return receipt requested, of all the terms and conditions of the proposed sale. Within thirty (30) days of the receipt of such notice, the other General Partner and the Limited Partners must either (i) consent to the sale; or (ii) agree to purchase the property on the same terms and conditions. All Partners desiring to permit the sale of the Property shall be entitled to receive payment in accordance with the terms of this agreement by the Partners desiring to remain in ownership of the Property.

### ARTICLE VII

### RIGHTS AND OBLIGATIONS OF THE LIMITED PARTNER

7.1 **Management of Business.** Except in instances where the consent of the Limited Partners is required by the terms of this Agreement, the Limited Partners shall not take part in the

19

RESPONDENTS
000059

management or control of the Partnership or have any power to sign for or to bind the Partnership.

7.2 **Outside Activities.** Nothing in this Agreement shall be deemed to preclude the Limited Partners or any Affiliate of the Limited Partners from engaging in any other business activity, or from receiving compensation therefrom or participating in the profits thereof, which activity may include the development or ownership of, or investment in, real estate and the operation and management of real estate at all places, whether or not in direct or indirect competition with the Property, and neither the Partnership nor any of the Partners shall have any rights by virtue of this Agreement in such business ventures or investments or to any income or profits derived therefrom. Such activity shall not be deemed to constitute a partnership opportunity.

7.3 **Limitation on Liabilities of the Limited Partner.** The Limited Partner shall have no personal liability with respect to liabilities and obligations of the Partnership and, except as provided in Article VI hereof, shall not be called upon or be liable for any contributions to the capital of the Partnership except as set forth in Sections 5.2, 5.3 and 5.4.

ARTICLE VIII

PROFIT, LOSS, DISTRIBUTIONS AND ELECTIONS

8.1 **Determination of Profit and Loss.** For the purposes of this Agreement and for Federal, state and local income tax purposes,

20

RESPONDENTS
000060

the terms "Profit" and "loss" shall mean the net profits and losses of the Partnership for Federal income tax purposes, as determined by the Partnership's Accountants.

8.2 **Allocation of Profits.** Profits of the Partnership shall be allocated to the Capital Accounts of the Partners in same percentage as set forth under sections 5.1(a) and (b).

8.3 **Distribution of Cash Flow.** From time to time but in no event less frequently than annually the General Partner, together with the Partnership's Accountants, shall determine the Cash Flow (as defined in Section 8.5 hereof) available for distribution to the Partners. Cash Flow shall be allocated and distributed on an annualized basis as follows:

(a) From any Cash Flow, to all the Partners allocated in accordance with the percentages set forth in Section 5.1 (a) and (b).

Distribution of cash flow shall be adjusted from time to time as provided in Section 10.1.

8.4 **Distribution of Net Cash Proceeds of Sale, Refinance, Etc. of the Property:**

(a) Net Cash Proceeds (as defined in subsection (b) hereof, if any resulting from the financing, sale or other disposition of all of the Property shall be distributed in the same manner as Profits as set forth in Sections 8.4(c)(i) and (ii).

(b) The term "Net Cash Proceeds" shall mean the cash proceeds remaining for distribution to the Partners after payment or deduction from the gross proceeds of all liabilities including

21

RESPONDENTS
000061

mortgages of the Partnership and reimbursement of all sums contributed by PR&PR to the Partnership plus twelve (12%) per cent interest per annum on the amount of all disbursements and contributions made by PR&PR to the Partnership and all charges and expenses necessary to the consummation of any such sale or other disposition. In the event the total contribution, additional contribution or expenses and interest to which PR&PR and the contribution or additional contribution of the Limited Partners should not aggregate the sum of $365,000, then and in such event the differential between the $365,000 and the sum actually contributed by PR&PR and the Limited Partners shall be paid to MFD. The said amount shall be determined at the closing of the permanent mortgage covering the Property.

(c) In the event the sale or refinancing of the Property and after the repayment and reimbursement to the Partners of their contribution to the Partnership, the Net Cash Proceeds shall be distributed as follows:

(i) if the Property is sold or refinanced during the first ten (10) year term of the Partnership, seventy (70%) per cent of such Net Cash Proceeds shall be distributed to PR&PR and to the Limited Partners in the same proportions as set forth in paragraph 5.1 (a) and (b) and thirty (30%) per cent shall be paid to MFD.

(ii) if the Property is sold or refinanced after the tenth (10th) year of the Partnership, the Net Cash Proceeds shall be distributed eighty (80%) per cent to PR&PR and to the Limited

22

RESPONDENTS
000062

Partners in the same proportions as set forth in paragraph 5.1 (a) and (b) and twenty (20%) per cent shall be paid to MFD.

8.5 **Definitions.** As used in this Article VIII, the term "Cash Flow" shall mean all cash receipts of the Partnership other than Capital Contributions and cash receipts arising out of the transactions referred to in Section 8.4 hereof, less the aggregate of (i) current charges and expenses other than depreciation; (ii) all legal fees and other expenses incurred in connection with the development of the Property; (iii) principal and amortization payments; (iv) amounts deposited to any reserve fund or fund for working capital established by the Managing General Partner (such deposits to any reserve fund or working capital fund to be made by the Managing General Partner in such amounts as it, in the exercise of sound business judgment; shall deem advisable and in the best interests of the Partnership); and (v) any reference in this Agreement or any part thereof referring to monies due or to be distributed to MFD shall be construed and intended to mean MFD or its designee.

8.6 **Tax Elections.** All elections required or permitted to be made by the Partnership shall be made in such manner as the General Partner, in consultation with the Partnership's Accountants, shall determine to be most favorable to the Partners. No Partner shall take any action or omit or refuse to take any action which would cause the Partnership to forfeit the benefits of any tax election previously made or to which there has been an agreement.

23

RESPONDENTS
000063

## ARTICLE IX

## BOOKS AND RECORDS; REPORTS; BANK ACCOUNTS

9.1  **Books of Accounts, Records.**  At all times during the continuance of the Partnership, the Managing General Partner shall keep or cause to be kept in accordance with generally accepted accounting principles (or, upon the advice of the Partnership's Accountants, on a cash basis, consistently applied), full and true books of account in which shall be entered fully and accurately all transactions of the Partnership. All of said books of account, together with a certified copy of the Certificate of Limited Partnership of the Partnership, any amendments thereto, and an executed copy of such other instruments as the Managing General Partner may be required to execute pursuant to Section 4.3, shall at all times be maintained at the principal office of the Partnership or at such other office of the Partnership as may be designated for such purpose by the General Partner in Westchester County or New York City and each Partner or any attorney and/or a certified public accountant designated by such Partner may at any time during reasonable business hours, at such Partner's expense, inspect, copy, and examine the books and records of the Partnership.

9.2  **Fiscal Year.**  The fiscal year of the Partnership shall be the calendar year.

24

RESPONDENTS
000064

9.3 **Financial Reports.** (a) The Managing General Partner shall take all steps reasonably necessary to cause to be delivered to each Partner within ninety (90) days after the expiration of each fiscal year of the Partnership, beginning with the fiscal year ending December 31, 1987 annual reports of the Partnership, including (a) a balance sheet and profit and loss statement, (b) a statement showing the distributions to the Partners and the allocation among the Capital Accounts of the Partners of taxable income, gains, losses, deductions, credits and other relevant items of the Partnership for such fiscal year, and (c) a statement of changes in financial position of the Partnership. All such reports and statements shall be prepared by the Partnership's Accountants in such manner as they determine.

(b) **Quarterly Statement**. The Managing General Partner or the Managing Agent shall deliver to each Partner within fifteen (15) days following the end of quarter, a statement of rents billed and received and expenses paid and accrued. Such statements shall include an itemization of the names of the tenants, the rents paid, the spaces occupied and the lease expiration dates.

9.4. **Tax Returns**. The Managing General Partner shall cause all income tax and other applicable information returns for the Partnership to be prepared by the Partnership's Accountants and shall cause such tax and information returns to be timely filed with the appropriate authorities. Copies of such tax and information returns shall be sent to each Partner and shall also

25

RESPONDENTS
000065

be kept at the principal office of the Partnership where they shall be available for inspection by the Partners and their representatives during normal business hours.

9.5 **Bank Accounts**. All funds of the Partnership shall be deposited in the name of the Partnership or in the name of its designee the Managing Agent Rosedale Management Company, Inc., in such account or accounts at National Westminster Bank, 1591 Central Park Avenue, Yonkers, New York 10710 or such other Bank as the Managing General Partner or the Managing Agent shall designate. All withdrawals therefrom or checks to be drawn shall be made upon the signature of the Managing General Partner or the Managing Agent. All deposits and other funds not currently needed in the operation of the Partnership's business shall, to the extent permitted by law, be deposited in such interest-bearing accounts or invested in such short-term obligations (maturing within one year or less) issued or guaranteed by the United States Government, or certificates of deposit of said banking institution (maturing within one year or less) as shall be determined by the Managing General Partner.

## ARTICLE X

### BANKRUPTCY, RESIGNATION, ETC. OF THE GENERAL PARTNER; TRANSFER OF INTERESTS

10.1 **Change in General Partner**. (a) The General Partners shall not be permitted to sell, assign, pledge, encumber, hypothecate or otherwise transfer all or any part of its legal or beneficial

26

RESPONDENTS
000066

interest in and to the Partnership or withdraw or retire as a General Partner or voluntarily dissolve or liquidate the Partnership without the prior consent of the Limited Partners except that the General Partner shall be permitted to sell his interest to a bona fide third party provided the General Partner gave the other General Partner and the Limited Partners a right of first refusal to purchase its interest in the Partnership on the same terms and conditions as has been agreed to by the bona fide third party, said right of first refusal to be for a period of thirty (30) days after receipt by the other General Partner and the Limited Partners of a written notice of the General Partner that it plans to sell its interest in the Partnership, which notice sets forth all of the terms and conditions of such sale and further provided that if the other General Partners and the Limited Partners do not exercise their right of first refusal, then the General Partner and its principal must guarantee to the other General Partner and the Limited Partner all of the obligations of the General Partner which exist as of the date of the sale of the General Partner's interest. Anything herein contained to the contrary notwithstanding, it is specifically agreed and understood between the General Partner that if and in the event a General Partner should desire to sell, transfer or assign its interest in the Partnership, it must first obtain the necessary approval from the mortgagee or mortgagees agreeing to such sale or transfer. If the sale or transfer should be considered an event of default under any of said

27

RESPONDENTS
000067

mortgages covering the Property which would accelerate the term of the mortgage and make it become due and payable the the said General Partner may not avail himself of the right to sell or transfer his interest in the Partnership.

(b) The withdrawal, removal or declaration of bankruptcy under the United States Bankruptcy Code of the Managing General Partner or any other event which results in the General Partner ceasing to be the Managing General Partner ("Terminating Event") shall cause the dissolution of the Partnership. In the event of such dissolution, the Limited Partners within ninety (90) days of such Terminating Event may elect to continue the business of the Partnership ("Terminating General Partner").

If the Terminating Event is by reason of the occurrence of any Terminating Event with respect to the Managing General Partner and within ninety (90) days of such Terminating Event, the Limited Partners appoint an outside person or entity as a Successor, the interests of the Limited Partner and Special Limited Partners, if any, (as provided in Section 10.1(c) shall be diluted to the extent of the interest of the Managing General Partner acquired by the Successor in the proportion that each such Partner's (inclusive of all special Limited Partners but exclusive of the Successor) Partnership Percentage bears to the aggregate of all such Partner's Percentages.

10.2 **Transfer of Limited Partner's Interests.** (a) No Limited Partner shall be permitted to sell, assign, pledge, encumber, hypothecate, or otherwise transfer all or any part of its

RESPONDENTS
000068

interest as a Limited Partner without the prior written consent of the Managing General Partner, which consent shall be in its sole and absolutely discretion. However, any assignment of transfer of any Limited Partners interest to a member of his family shall be permitted.

(b) Upon the death, judicial adjudication or incompetency or the declaration of bankruptcy under the United States Bankruptcy Code or other cessation to exist as a legal entity of any Limited Partner which is a corporation trust or other entity, the legal authorized representative, assign or successor of said Limited Partner shall have all of the rights of said Limited Partner for the purpose of effecting the orderly winding up and disposition of the business of such entity and such power as such entity possessed to make an assignment of its interest in the Partnership in accordance with this Section 10.2.

10.3  **Substituted Limited Partners.**  (a)  No purported transfer of all or any part of a Limited Partner's interest in the Partnership shall be effective unless the assignee or assignees of the transferor shall deliver to the Managing General Partner, as conditions precedent to being admitted to the Partnership as the substituted Limited Partner, the following instruments:

> (i)  an instrument, in form and substance satisfactory to the Partnership's Counsel, expressly stating the transferee's intention to be substituted as a Limited Partner and

29

RESPONDENTS
000069

such transferee's acceptance and adoption of all of the terms of the Agreement;

(ii) a Power of Attorney substantially in compliance with the requirements set forth in Section 4.3 of this agreement; and

(iii) such other certificates, instruments, agreements or documents as the Managing General Partner and/or the Partnership's counsel may reasonably require in order to effect the substitution of such person or entity as a substituted Limited Partner.

(b) An assignee of all or any part of the Partnership interests of a Limited Partner who in all respects has complied with paragraph (a) of Section 10.4 shall be admitted as a substituted Limited Partner.

10.4 **Amendment of Certificate Upon Transfer or Change of Interest.** Upon the change of a General Partner or admission of a substituted Limited Partner, the then remaining General Partner or its Successor, as the case may be, shall prepare and file an amendment to the Certificate of Limited Partnership and may, for this purpose, exercise the Power of Attorney granted pursuant to Section 4.3. In the event such amendment is occasioned by the admission of a substituted Limited Partner, the costs of preparing and filing the amendment shall be paid by the Limited Partner assigning its interest in the Partnership or by his assignee. Upon the admission of a Successor to the General

30

RESPONDENTS
000070

Partner or upon the reconstitution of the Partnership and the admission of a successor General Partner, the Limited Partners shall execute a new power of attorney naming the successor General Partner as the attorney-in-fact for the Limited Partner and the costs of preparing and filing of the amendment and such new powers shall be paid by the Partnership.

## ARTICLE XI

## DISSOLUTION, LIQUIDATION AND TERMINATION

11.1 **Dissolution.** Subject to the provisions of Section 10.1, the Partnership shall be dissolved upon the happening of any of the events specified in subsections (a) and (b) of Section 10.3. The declaration of bankruptcy under the United States Bankruptcy Code or the death, judicial adjudication of incompetency, or the insolvency or dissolution of any or all of the Limited Partners shall not cause the dissolution of the Partnership. Dissolution shall be effective as of the date of the event giving rise to the dissolution, but the Partnership shall not terminate until the Property has been liquidated and the proceeds thereof have been distributed in accordance with the provisions of Sections 11.4 hereof.

11.2 **Liquidating Trustee.** Upon the dissolution of the Partnership without a reconstitution of the Partnership as provided for in Section 10.1 hereof, the liquidating trustee (which shall be the Managing General Partner, unless the Managing

31

RESPONDENTS
000071

General Partner is the subject of one of the events set forth in subsection (b) or (d) of Section 10.4, in which case, if there is no General Partner, then a person selected by the Limited Partners shall liquidate the assets of the Partnership as promptly as possible, but in an orderly and businesslike manner as is consistent with obtaining the fair value thereof, and shall distribute the Partnership's assets in accordance with the provisions of Section 11.4 hereof. During the interim, the liquidating trustee shall continue to conserve the rights and assets of the Partnership consistent with the liquidation thereof, exercising in connection therewith all of the power and authority of the Managing General Partner as herein set forth.

11.3 **Accounting on Dissolution.** Upon the dissolution and termination of the Partnership, unless the Partnership is reconstituted as provided in Section 10.1 of this Agreement, the liquidating trustee shall cause the Partnership's Accountants to make a full and proper accounting of the Partnership's assets, liabilities and operations as of the date of dissolution and shall furnish copies of such accounting to the Partners within ninety (90) days after such dissolution.

11.4 **Liquidation and Termination.** The proceeds of such liquidation shall be applied and distributed by the liquidating trustee in the following order of priority:

(a) **First,** the debts and liabilities of the Partnership (other than those to Partners) and the expenses of liquidation shall be paid or provided for (whether by

such reserve as the liquidating trustee shall deem appropriate or otherwise);

(b)   <u>Second,</u> all of the liabilities and obligations of the Partnership to Partners shall be paid or provided for (whether by such reserve as the liquidating trustee shall deem appropriate or otherwise);

(c)   <u>Third,</u> the cash and other assets remaining shall be distributed to the Partners in the manner and in the percentage interest provided for in Article V and Article VIII.

11.5   <u>Distribution in Kind.</u>   No Partner shall have any right to demand and receive property other than cash.  Each Partner waives its rights to bring an action for partition and agrees not to bring an action for partition.

11.6   <u>Filing of Certificate of Cancellation.</u>   Upon the dissolution and termination of the Partnership, the liquidating trustee shall cause a Certificate of Dissolution to be filed in accordance with the Partnership Law of the State of New York.

33

RESPONDENTS
000072

## ARTICLE XII

## ARBITRATION

12.1 **Agreement of Arbitration.** Any disagreements arising out of this Agreement or from the breach of it shall be submitted to arbitration. It is mutually agreed that the arbitration contemplated herein shall be non-binding. However, the decision of the arbitrators shall be a condition precedent to any right of legal action that any party may have againt the other.

The parties may agree upon one Arbitrator; otherwise there shall be three, one named in writing by each party of this contract within five days after notice of arbitration is served by either party upon the other, and a third Arbitrator selected by these two Arbitrators within five days thereafter. No one shall serve as an Arbitrator who is in any way financially interested in this agreement or in the affairs of any party herein.

At the written request of any party, at any time prior to the complete appointment of Arbitrators, as provided above, or in the event of any default or lapse in the proceeding, the arbitration shall be held under the Standard Form of Arbitration Procedure of the American Arbitration Association.

34

RESPONDENTS
000073

12.1  **Notice.**  (a)  Unless otherwise specified in this Agreement, all notices, demands, requests or other communications which any of the parties to this Agreement may desire or be required to give hereunder (hereinafter referred to collectively as "Notice") shall be in writing and shall be deemed to have been duly and properly given or made if delivered personally or mailed by certified or registered mail, return receipt requested, posted prepaid, addressed as follows:

(i)  If to the Partnership or to the Managing General Partner, addressed to:

475 Tuckahoe Road, Yonkers, N. Y. 10710

If to the other General Partner, addressed to:

c/o Barry Mallin, Esq.

56 Thomas Street, New York, N. Y. 10013

(ii)  If to the Limited Partners, copies addressed to them at the addresses set forth next to their names at the beginning of this agreement.

Any notice, consent, other consent, other communication, distribution or payment shall be deemed given or made, if personally delivered then on the date delivered, or if mailed aforesaid then three days after the postmark thereof. The Partners may change their addresses for the purpose of this Section 12.1.

12.2  **Counterparts.**  This Agreement may be executed in two or more counterparts, each of which shall constitute an original,

35

RESPONDENTS
000074

but all of which shall together constitute one and the same instrument.

12.3   **Headings**.   The Article, Section and Paragraph headings contained in this Agreement are for convenience of reference only and are not intended to define, limit or describe the scope or intent of any provision of this Agreement.

12.4   **Number and gender.**   Whenever in this Agreement the singular is used, it shall include the plural if the context so requires, and whenever the masculine gender is used in this Agreement, it shall be construed as if the masculine, feminine or neuter gender, respectively, has been used where the context so dictates, with the rest of the sentence being construed as if the grammatical and terminological changes thereby rendered necessary have been made.

12.5   **Entire Agreement.**   This Agreement contains the entire understanding between and among the parties with respect to the subject matter hereof and supersedes any prior understandings and agreements between and among them respecting such subject matter.

12.6   **Severability.**   Any provision of this Agreement which may be determined to be unenforceable under the laws of the State of New York or any other applicable laws shall be construed as severable from the other provisions of this Agreement without in any way affecting the enforceability of the remaining provisions.

12.7   **Governing Law.**   This Agreement shall be constructed and interpreted in accordance with and governed by the laws of the State of New York.

36

RESPONDENTS
000075

12.8  **Binding Effect.**  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their respective heirs, personal or legal representatives, executors, administrators, successors and permitted assigns.


IN WITNESS WHEREOF, each of the parties hereto has executed this Agreement as of the date and year first above written.

GENERAL PARTNERS:                    LIMITED PARTNERS:

MIDWOOD FRIENDS DEVELOPMENT CORP.    _____
                                     SEYMOUR B. ROBINSON
BY:_____
                                     _____
                                     JEROME S. REZNICK
PR & PR REALTY CORP.
                                     _____
BY:_____         JONATHAN POOLE
   President
                                     _____
                                     LAWRENCE PESCE

RESPONDENTS
000076

STATE OF NEW YORK )
) ss:-
COUNTY OF NEW YORK )

On the *19* day of November, in the year one thousand nine hundred and eighty seven before me personally came *DONALD SHIFFMAN* to me known, who being by me duly sworn, did depose and say that he resides at No. *863 PRESIDENT STREET BKLYN, N.Y* ; that he is the *PRESIDENT* of MIDWOOD FRIENDS DEVELOPMENT CORP, the corporation described in, and which executed the above instrument; that it was so executed by order of the Board of Directors of said corporation and that he signed his name thereto by like order.

REINALDO R. CARDONA JR.
Notary Public, State of New York
No. 26-4628417
Qualified in Kings County
Commission Expires March 30, 19
7/31/88

_____
Notary Public

STATE OF NEW YORK )
) ss:-
COUNTY OF NEW YORK )

On this *19* day of November, in the year one thousand nine hundred and eighty seven before me personally came *JONATHAN POOLE* to me known, who being by me duly sworn, did depose and say that he resides at No. *263 East 19 Street, New York, N.Y.* ; that he is the *PRESIDENT* of PR & PR REALTY CORP., the corporation described in, which executed the above instrument; that it was so executed by order of the Board of Directors of said corporation and that he signed his name thereto by like order.

JULES W. SCHAPIRO
Notary Public, State of New York
No. 8791015
Qualified in New York Co.
Commission Expires April 30, 19 88

_____
Notary Public

STATE OF *New York* )
) ss:-
COUNTY OF *New York* )

On this *19* day of November, nineteen hundred and eighty seven before me came SEYMOUR B. ROBINSON to me known to be the individual described in, and who executed, the foregoing instrument, and acknowledged that he executed the same.

JULES W. SCHAPIRO
Notary Public, State of New York
No. 8791015
Qualified in New York Co.
Commission Expires April 30, 19 88

_____
Notary Public

RESPONDENTS
000077

STATE OF NEW YORK    )
                     )  ss:-
COUNTY OF NEW YORK   )

On this 19 day of November, nineteen hundred and eighty seven, before me came JEROME S. REZNICK to me known to be the individual described in, and who executed, the foregoing instrument, and acknowledged that he executed the same.

JULES W. SCHAPIRO
Notary Public, State of New York
No. 8791015
Qualified in New York Co.
Commission Expires April 30, 19 88

_____
Notary Public


STATE OF NEW YORK    )
                     )  ss:-
COUNTY OF NEW YORK   )

On this 19 day of November, nineteen hundred and eighty seven, before me came JONATHAN POOLE to me known to be the individual described in, and who executed, the foregoing instrument, and acknowledged that he executed the same.

JULES W. SCHAPIRO
Notary Public, State of New York
No. 8791015
Qualified in New York Co.
Commission Expires April 30, 19 88

_____
Notary Public


STATE OF NEW YORK    )
                     )  ss:-
COUNTY OF NEW YORK   )

On this 19 day of November, nineteen hundred and eighty seven, before me came LAWRENCE PESCE to me known to be the individual described in, and who executed, the foregoing instrument, and acknowledged that he executed the same.

JULES W. SCHAPIRO
Notary Public, State of New York
No. 8791015
Qualified in New York Co.
Commission Expires April 30, 19 88

_____
Notary Public

## SCHEDULE A

All that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Brooklyn, County of Kings, City and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the Westerly side of 20th Avenue with the Southerly side of 51st Street;

RUNNING THENCE Southerly along the Westerly side of 20th Avenue, 100 feet 2 inches to the center line of the block;

THENCE Westerly and parallel with 51st Street, 118 feet 8 inches;

THENCE Northerly and parallel with 20th Avenue and part of the distance through a party wall, 100 feet 2 inches to the Southerly side of 51st street;

THENCE Easterly along the Southerly side of 51st Street, 118 feet 8 inches to the corner, the point or place of BEGINNING:

Said premises being known as 1974 51st Street, Brooklyn, New York

RESPONDENTS
000079

LIMITED PARTNERSHIP AGREEMENT

OF

1974 REALTY ASSOCIATES

**JULES W. SCHAPIRO**
ATTORNEY AT LAW
300 EAST 42ND STREET
NEW YORK, NEW YORK 10017
(212) 661-1616

RESPONDENTS
000080